**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                             :
**ULLISES SHIPPING CORP.,**                  :
                                             :
                          **Plaintiff,**     :
                                             :    **OPINION & ORDER**
          **- against -**                    :
                                             :    **05 Civ. 9424 (SAS)**
**FAL SHIPPING CO. LTD, FAL OIL CO. LTD** :
**and FAL ENERGY CO. LTD.**                  :
                                             :
                        **Defendants.**      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Ullises Shipping Corp. ("Ullises") filed this action on November 7,

2005 and obtained an ex parte order of maritime attachment and garnishment

pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime

Claims of the Federal Rules of Civil Procedure ("Admiralty Rules"). On

November 8, 2005, this Court ordered the attachment of $8,773,895 of FAL

Shipping Co. Ltd. ("FAL Shipping") and FAL Oil Co. Ltd.'s ("FAL Oil") assets,

and on December 1, 2005, this Court amended the order to include FAL Energy

Co. Ltd.'s ("FAL Energy," and together with FAL Shipping and FAL Oil, "FAL")

assets (the "Attachment Order"). FAL now moves to vacate the Attachment Order

and for counter-security. This Court held a post-attachment hearing on January 6,

1

2006. For the following reasons, the motion to vacate the Attachment Order as to FAL Shipping and FAL Oil is denied, the motion to vacate the Attachment Order as to FAL Energy is granted, and FAL's motion for counter-security is granted.

## II.    BACKGROUND

### A.    The Parties

Ullises is a corporation organized under the laws of Liberia.[1]  FAL is a foreign corporation with a principal place of business in the United Arab Emirates ("UAE").[2]  FAL trades fuel oil in the Persian Gulf.[3]  FAL Oil buys and sells oil cargoes.[4]  FAL Energy is FAL's "marketing arm."[5]  FAL Shipping "operates as the shipping arm of the FAL business with responsibility of carriage of cargoes on vessels both owned and chartered."[6]  FAL Shipping owns a fleet of

---

[1]    *See* Amended Verified Complaint ("Compl.") ¶ 2.

[2]    *See id.* ¶ 4.

[3]    *See* Declaration of Maria Moisidou, English Solicitor for Ullises ("Moisidou Decl.") ¶ 2.

[4]    *See* Witness Statement of Dr. Ramzy Zakaria Mohamed, Legal Advisor to FAL ("Mohamed Statement"), ¶7, Ex. 4 to Affirmation of Mohamed Osman Fadul ("Fadul Aff.").

[5]    FAL Company Profile, *at* http://www.falgroup.co.ae/p7.html, Ex. 6 to Moisidou Decl.

[6]    Mohamed Statement ¶ 7.

2

seven vessels which operate within the coastal waters of the UAE.[7] The

defendants are privately owned and controlled by Abdulla Juma Al Sari and his

family.[8] Each of the FAL defendants is separately registered under UAE law and

keeps separate books and records.[9] The companies "do not have a board of

directors as it is understood in England."[10] They share employees and the same

general manager, Mohammed Osman Fadul.[11] They also share the same legal

address, offices, and fax and telephone numbers.[12] FAL Oil and FAL Energy

issued a statement on FAL Energy stationery notifying customers that FAL was

---

[7]    *See* 1/6/06 Hearing Transcript ("Tr.") at 22; Reply Affirmation of
Michael J. Frevola ("Frevola Reply Aff."), Counsel to FAL at Ex. 1.

[8]    *See* Moisidou Decl. ¶ 32. Al Sari's sons own 50% of the shares in
FAL Oil. *See id.* ¶ 31. FAL Oil owns 50% of the shares in FAL Shipping, and Al
Sari owns 50%. *See id.*

[9]    *See* Fadul Aff. ¶ 8; 12/22/05 Letter from Samir Madbak, Partner,
Deloitte and Touche (UAE office) to FAL Shipping Shareholders, Ex. 5 to Fadul
Aff. (stating that FAL Oil, FAL Energy and FAL Shipping "are separate legal
entities constituted under the United Arab Emirates Federal Law No. 8 of 1984, as
amended, and are having separate books of account"). The letter contains the
disclaimer that it is "issued to the shareholders of the Company upon their request
without any responsibility from our part." *Id.*

[10]    Witness Statement of Mohammed Osman Fadul ("Fadul Statement"),
¶7, Ex. 3 to Fadul Aff.

[11]    *See* Moisidou Decl. ¶ 33.

[12]    *See id.*

3

not involved in unlawful oil trading.[13]  On twelve occasions, invoices owed by

FAL Shipping to Ullises were paid from the bank accounts of FAL Oil.[14]

## B.    The Underlying Dispute

The dispute between the parties arises out of the loss of the M/V

GREEK FIGHTER ("Vessel") chartered to FAL Shipping by Ullises, and related

litigation in the High Court of London (the "London Litigation").[15]  Ullises alleges

that it agreed to charter the Vessel to FAL Shipping on March 16, 2000.[16]  On

December 13, 2001, the Vessel was detained on suspicion of carrying oil subject

to the Iraqi embargo.[17]  Subsequent to the detention of the Vessel, Ullises alleges

that FAL Shipping ceased making payments to Ullises, the Vessel was declared

forfeit, and on March 12, 2003, the Vessel was auctioned for scrap in Abu Dhabi.[18]

Ullises brought the London Litigation in 2003 arguing that it has suffered damages

---

[13]    *See* 6/12/02 Statement, Ex. 3 to Moisidou Decl.

[14]    *See id.* at Ex. 7.

[15]    *See* Compl. ¶¶ 3, 5, 11.

[16]    *See id.* ¶ 5.

[17]    *See id.* ¶ 6; Defendants' Memorandum in Support of Their Motion to Vacate or Reduce Maritime Attachments and Counterclaim for Security ("FAL Mem.") at 2.

[18]    *See* Compl. ¶ 9.

from the loss of the Vessel.[19]  The parties have concluded trial and are awaiting a decision.[20]

## B. Ullises' Attempts to Obtain Security

Ullises did not request that the London court order FAL Shipping to post security,[21] allegedly because it could not locate any assets belonging to FAL in England.[22]  Ullises attempted to arrest a vessel in Singapore that had belonged to FAL, but upon the arrest, Ullises learned that the vessel had been sold.[23]

After obtaining the Attachment Order from this Court, Ullises served a process of maritime attachment and garnishment on certain garnishee banks, including Societe Generale Internationale ("Soceite Generale") and Bank of America, N.A. ("BANA").  Ullises has agreements with each of the garnishee banks to receive service by fax or e-mail.[24]

---

[19]  *See* FAL Mem. at 10 (citing Affirmation of Dominic Hugh Lang, Solicitor for FAL Shipping ¶¶ 4-10).

[20]  *See id.*

[21]  *See id.*

[22]  *See* Moisidou Decl. at 29.

[23]  *See* Tr. at 22.

[24]  *See* Second Declaration of Patrick F. Lennon in Support of Plaintiff's Opposition to Motion to Vacate Maritime Attachment ("Second Lennon Decl.") at Ex. 1; 1/13/06 Letter from Lennon to the Court (attaching consent form from Societe Generale).

Between November 28, 2005 and December 20, 2005, funds totaling

$40 million were frozen or attached, in excess of the Court-ordered amount.[25] In

response, Ullises obtained an order from this Court directing the release of $7.7

million held by Societe Generale.[26] With Ullises' consent, BANA unfroze a $23.8

million bank transfer.[27] FAL complains that it has suffered damages as a result of

these unauthorized asset freezes.[28] FAL also asserts that Ullises remains

oversecured in the amount of approximately $220,000,[29] and that $8.2 million of

the attached assets are in the name of FAL Oil or FAL Energy.[30]

Ullises alleges that FAL breached an agreement to post a bank

guarantee in exchange for release of the attached funds and dismissal of this

---

[25]    See FAL Mem. at 3-5 (citing Ex. 1 to Fadul Aff.). Approximately
five million dollars was immediately released by the attaching bank Societe
Generale Internationale, because it had reached the attachment limit of $8.77
million. See id. at 4.

[26]    See 12/21/05 Consent Order.

[27]    See Declaration of Barry J. Glickman, Attorney for Garnishee BANA,
¶ 4.

[28]    See FAL Mem. at 5; Verified Answer, Counterclaims and Demand for
Counter-Security ("FAL Counterclaims") ¶¶ 64-85.

[29]    See Frevola Reply Aff. ¶ 4.

[30]    See FAL Mem. at 6.

case.[31] FAL claims that it was not able to post a bank guarantee because the banks were unwilling to issue a guarantee to Ullises, which is part of a bankrupt corporate family, and also because the underlying dispute here involves an alleged violation of the Iraqi embargo.[32]

In support of its motion to vacate the attachment, FAL argues that *first*, the assets of FAL Oil and FAL Energy were improperly attached because FAL Oil and FAL Energy are not defendants in the London Litigation, *second*, Ullises has not made the requisite showing of a need for security against any of the FAL defendants, *third*, principles of quasi in rem jurisdiction bar the attachment, and *fourth*, the amount of the attachment is excessive. FAL argues that if this Court does not vacate the attachment, FAL is entitled to counter-security in the amount of its attorneys' fees in the London Litigation and counterclaims in this action.

## II.  LEGAL STANDARD

### A.  Supplemental Rule E(4)(f)

Under Supplemental Rule B "an order of maritime attachment must

---

[31]     *See* Plaintiff's Memorandum of Law in Opposition to Motion to Vacate Maritime Attachment ("Ullises Mem.") at 12.

[32]     *See* Tr. at 46. FAL alleges that an affiliate of Ullises sank the vessel PRESTIGE off the coast of Spain in 2003, causing an environmental disaster. *See* FAL Reply at 4.

issue upon a minimal prima facie showing"[33] provided the defendant cannot be "found within" the federal district in which the assets are sought to be attached.[34] But under Supplemental Rule E(4)(f), "any person claiming an interest in [the attached property] shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the . . . attachment should not be vacated or other relief granted consistent with these rules."[35] "It is clear from the text of [Rule E(4)(f)] that . . . the party having obtained the maritime attachment, bears the burden of showing that the attachment should not be vacated."[36] "The post-arrest hearing is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant."[37] Therefore, the plaintiff must present evidence

---

[33] *Seaplus Line Co. v. Bulkhandling Handymax,* No. 05 Civ. 4813 (JGK), 2005 WL 3455816, at *2-3 (S.D.N.Y. Dec. 13, 2005) (citations omitted).

[34] Fed. R. Civ. P. Supp. R. B(1).

[35] Fed. R. Civ. P. Supp. R. E(4)(f).

[36] *Seaplus Line Co.,* 2005 WL 3455816, at *3.

[37] *Salazar v. Atlantic Sun,* 881 F.2d 73, 79-80 (3rd Cir. 1989). *Accord Linea Navira De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A.,* 169 F. Supp. 2d 1341, 1359 (M.D. Fla. 2001); *Thypin Steel Co. v. Certain Bills of Lading,* No. 96 Civ. 2166, 1996 WL 223896, at *4 (S.D.N.Y. May 2, 1996); *Continental Ins. Co. v. Adriatic Tankers Ship. Co.,* Nos. Civ. A. 95-3564, 95-3571, 1995 WL 649942, at *1 (E.D. La. Nov. 2, 1995); *Newport News Shipbuilding & Dry Dock Co. v. S.S. Independence,* 872 F. Supp. 262, 265 (E.D.Va. 1994). This standard has been defined as "probable cause" or "reasonable grounds." *Linea Navira De*

showing that the attachment was reasonable. In *Allied Maritime v. The Rice Corp.*, this Court held that the evidence presented by the plaintiff must demonstrate "*either* that the attachment is necessary for the plaintiff to obtain jurisdiction in a convenient district, *or* that the plaintiff needs the security of the attachment to satisfy any judgment it may win in the underlying suit."[38]

## A. Piercing the Corporate Veil

"Federal courts sitting in admiralty apply federal common law when

---

*Cabotaje, C.A.*, 169 F. Supp. 2d at 1359. The standard applies to post-attachment cases as well as post-arrest cases. *See Continental Ins. Co.*, 1995 WL 649942, at *1 n.2.

[38] No. 04 Civ. 7029, 2004 WL 2284389, at *2 (S.D.N.Y. Oct. 12, 2004), *motion for reconsideration denied*, 361 F. Supp. 2d 148 (S.D.N.Y. 2004) (emphasis in original). *Accord Seaplus Line Co.*, 2005 WL 3455816, at *3 ("*Allied Maritime* is consistent with longstanding practice"); *Aqua Stoli v. Gardner Smith Pty*, 384 F. Supp. 2d 726, 729 (S.D.N.Y. 2005). *But see Blake Maritime v. Petrom S.A.*, No. 05 Civ. 8033, 2005 WL 2875335, at *4 (S.D.N.Y. Oct. 31, 2005) (plaintiff need only demonstrate a maritime claim and that the defendant cannot be found in this district).

The *Aqua Stoli* and *Seaplus Line Co.* courts applied an additional test, holding that the attachment may be vacated if the defendant shows that the hardship imposed outweighs the benefit to the plaintiff. *See Seaplus Line Co.*, 2005 WL 3455816, at *3; *Aqua Stoli*, 384 F. Supp. 2d at 729. But every defendant suffers a hardship when its assets are attached. Here, FAL does not demonstrate any unique hardship that would outweigh the plaintiff's reasonable grounds for attachment.

examining corporate identity."[39] "Federal common law allows piercing of the corporate veil where (1) a corporation uses its alter ego to perpetrate a fraud *or* (2) where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own."[40] Under that standard, "[o]wnership by a parent of all its subsidiary's stock [is] an insufficient reason in and of itself to disregard distinct corporate entities. Actual domination, rather than the opportunity to exercise control, must be shown."[41] At a post-attachment hearing, a plaintiff asserting corporate alter egos need not definitively establish domination and control, but must present enough evidence to convince the court that there are reasonable grounds for piercing the corporate veil.[42]

## B.    Need for Security

---

[39]    *Status Int'l S.A. v. M&D Maritime Ltd.*, 994 F. Supp. 182, 186 (S.D.N.Y. 1998) (citing *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 342 (2d Cir. 1986)).

[40]    *Id.* (citing *Dow Chemical*, 782 F.2d at 342; *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 984-85 (2d Cir. 1980)).

[41]    *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) (quoting *Williams v. McAllister Bros. Inc.*, 534 F.2d 19, 21 (2d Cir. 1976))

[42]    *See Linea Navira De Cabotaje, C.A.*, 169 F. Supp. 2d at 1359; *A. Coker & Co. v. Nat'l Shipping Agency Corp.*, No. Civ. A. 99-1440, 1999 WL 311941, at *2 (E.D. La. May 17, 1999).

To counteract the ease with which a maritime attachment can be obtained, "courts have long recognized their responsibility to ask whether 'plaintiff's need for security is real.'"[43] To demonstrate the need for security, a plaintiff must show "a substantial risk [that it will not] be able to locate sufficient assets to satisfy its claims."[44] The need for security must be stronger than that of a typical plaintiff in a civil action.[45] Tangible evidence is required; hypothetical scenarios and speculation will not suffice.[46]

## C.    Service

In *Reibor International, Ltd v. Cargo Carriers (KACZ-CO.) Ltd.*, the Second Circuit held that a process of maritime attachment is void unless, at the time of service, there is a res capable of being attached; the fact that property subsequently comes into the possession of the garnishee does not revive the voided process.[47] The purpose of this rule is to honor the quasi-in-rem

---

[43]    *Seaplus Line Co.*, 2005 WL 3455816, at *8 (quoting *Integrated Container Serv. v. Starlines Container Shipping*, 476 F. Supp. 119, 124 (S.D.N.Y. 1974)).

[44]    *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa, S.A.*, 845 F. Supp. 150, 153 (S.D.N.Y. 1994), *aff'd*, 56 F.3d 359 (2d Cir. 1995).

[45]    *See Allied Maritime*, 2004 WL 2284389, at *2 (citing *Royal Swan Navigation v. Global Container Lines*, 868 F. Supp. 599, 606 (S.D.N.Y. 1994)).

[46]    *See id.* at *2 (citation omitted).

[47]    759 F.2d 262 (2d Cir. 1985).

characteristic of maritime attachment and "'minimize[] the burden of remaining vigilant'" imposed upon the garnishee.[48] The *Reibor* court held that it was unfair to require garnishees "to search high and low for a period of up to twenty days" and that the case was distinct from cases where garnishees "fully expected to come into possession of the property sought to be attached within a matter of hours."[49]

In *Winter Storm Shipping Ltd. v. TPI*, the Second Circuit held that electronic funds transfers ("EFTs") were subject to maritime attachment.[50] *Winter Storm* created an "exception to the requirement that process and a *res* must coexist in the hands of the garnishee at a single moment in time."[51] An EFT may be in the possession of a financial institution for only a very short period of time.[52] In *Ythan Ltd. v. Americas Bulk Transport Ltd.*, a garnishee bank agreed to accept service via facsimile once per business day, which service was "effective throughout the remainder of that particular business day so as to avoid the

---

[48]   *Ythan Ltd. v. Americas Bulk Transport Ltd.*, 336 F. Supp. 2d 305, 307 (S.D.N.Y. 2004) (quoting *Reibor Int'l Ltd.*, 759 F.2d at 267)).

[49]   *See Reibor Int'l Ltd.*, 759 F.2d at 267-68 (distinguishing *Ratto v. Italia, Flotte Riunite Cosulich*, 12 N.Y.S.2d 617, 620 (N.Y. City Ct. 1938), *aff'd*, (1st Dep't 1939); *Shurtleff v. Huber*, 186 F. Supp. 241, 244 (S.D.N.Y. 1960)).

[50]   310 F.3d 263 (2d Cir. 2002).

[51]   *Ythan Ltd.*, 336 F. Supp. 2d at 307.

[52]   *See Winter Storm*, 310 F.3d at 278 (an EFT may move through an intermediary bank "almost instantaneously").

12

'absurdity' of having to continuously accept service of process throughout the day."[53] The court held that this agreement did not violate *Reibor*.[54] Just as the bank was free to accept service by facsimile, "so as to avoid inconvenience to itself of calls to (or from) a lobby security desk announcing the anticipated (or actual) arrival of the process server . . . so too was it capable of agreeing that it would deem process effective through the close of the business day."[55]

**D.    Reduction in Security**

This Court has held that a reduction in security is "freely granted upon a showing that the [attachment] is excessive. . . . [I]n an attachment proceeding, the plaintiff need not prove its damages with exactitude. But the court must be satisfied that the plaintiff's claims are not frivolous."[56]

**E.    Counter-security**

Supplemental Rule E(7) allows defendants to seek counter-security when the "counterclaim arises from the same transaction or occurrence that is the

---

[53]    336 F. Supp. 2d at 307 (quotation marks omitted).

[54]    *See id.*

[55]    *Id.*

[56]    *Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235, 237 (S.D.N.Y. 1996) (citations omitted).

13

subject of the original action."[57] The Second Circuit has held that counter-security is appropriate under Supplemental Rule E(7) only "when a defendant whose property has been attached asserts non-frivolous counterclaims growing out of the same transaction."[58]

## III. DISCUSSION

### A. Piercing the Corporate Veil

FAL argues that the attachment should be vacated as to FAL Oil and FAL Energy, because neither is a defendant in the London Litigation. Ullises argues that it has justified the attachment of the assets of FAL Oil and FAL Energy because it has made a minimal prima facie showing that FAL Oil, FAL Energy, and FAL Shipping are alter-egos, partners, or joint venturers.[59] But although a minimal prima facie showing is sufficient to justify an attachment under Rule B, under Rule E(4)(f), Ullises has the burden of presenting some evidence showing reasonable grounds for the attachment.

---

[57]     Fed. R. Civ. P. Supp. R. E(7).

[58]     *Result Shipping Co. v. Ferruzzi Trading USA, Inc.*, 56 F.3d 394, 399-400 (2d Cir. 1995).

[59]     FAL requests that this Court disregard the "new facts" submitted in Ullises' opposition brief. *See* FAL Reply at 9-10. This request is denied because these putative "new facts" are merely quotations from a document previously submitted to the Court by defendants. *See* Ullises Mem. at 2 (citing Mohamed Statement ¶¶ 4-7).

14

Ullises provides no facts in support of its "partner" and "joint venturer" theories, nor does it present any evidence that the FAL defendants use one another as alter egos to perpetrate a fraud. Furthermore, with regard to FAL Energy, the evidence Ullises presents falls short of creating reasonable grounds for attaching FAL Energy's assets. It is not sufficient that FAL Energy and the other FAL Defendants share common ownership. Nor is it sufficient that FAL Energy does not observe some of the formalities of separate corporate existence. The only evidence presented by Ullises specifically pertaining to FAL Energy is a statement on FAL Energy stationery sent "to whom it may concern" by both FAL Energy and FAL Oil disclaiming involvement in "illegal activities" by the "FAL Group of Companies."[60] The issuance of a joint statement is not a reasonable ground for concluding that FAL Energy dominates and controls FAL Oil.

On the other hand, Ullises presents enough evidence to satisfy its burden with respect to FAL Oil.[61] FAL Oil paid FAL Shipping's debts under the

---

[60]    6/12/02 Statement, Ex. 3 to Moisidou Decl.

[61]    Ullises makes much of the statement of FAL's Legal Advisor, Ramzy Mohamed, that "[f]or most practical purposes, there is no relevant distinction between [FAL Shipping and FAL Oil] and I shall refer simply to 'FAL' or 'we' except where it is necessary to refer specifically to one or [the] other of them." Mohamed Statement ¶ 7. But this is not an admission that FAL Shipping and FAL Oil are one and the same; rather, Mohamed merely stated that for purposes of the London Litigation, it was unnecessary to distinguish the two companies. *See id.* ("[f]or the purposes of this litigation and this witness statement, we are concerned

15

agreement with Ullises from FAL Oil accounts. In combination with the evidence

of their overlapping ownership, management, and purposes, this evidence

collectively demonstrates that FAL Oil and FAL Shipping do not operate at arms

length and suggests that FAL Oil may exercise domination and control over FAL

Shipping.[62] Although this is not conclusive evidence, Ullises has met its burden of

showing reasonable grounds for attaching the assets of FAL Oil.

## B. Need for Security

Ullises has justified the continued attachment on the ground of its

need for security.[63] FAL submitted financial statements demonstrating that FAL

Shipping has sufficient assets to cover any judgment the London court might

award against it.[64] Despite FAL's financial strength, Ullises has shown that there

---

only with FAL Oil and FAL Shipping").

[62]   *See Linea Navira De Cabotaje, C.A.,* 169 F. Supp. 2d at 1359-60
(affirming denial of request to dissolve attachments because offer of corporation to
pay debts of affiliate in settlement negotiations was "some evidence" of
commonality and control).

[63]   Because FAL appeared in the London Litigation, Ullises does not
claim that the attachment is necessary to obtain jurisdiction over FAL.

[64]   FAL provided audited financial information showing that FAL
Shipping had nearly $51 million in assets at the end of 2004 . *See* 12/21/05 Letter
from Samir Madbak, Partner, Deloitte and Touche (UAE office) to FAL Shipping
Shareholders ("12/21/05 Madbak Letter"), Ex. 5 to Fadul Aff. FAL also alleged
that unaudited financial information for 2005 reveals assets of nearly $98 million.
*See id.* FAL Oil had nearly $353 million in assets at the end of 2004, and alleged
that unaudited financial information for 2005 reveals assets of nearly $628

is a substantial risk that any judgment rendered against FAL would be unenforceable, because FAL's assets are sheltered in the UAE.[65] Ian David Edge, Ullises' expert in UAE law, stated that civil process in the UAE can take many years.[66] The UAE does not have a treaty with the UK for the enforcement of foreign judgments or arbitration awards.[67] Under UAE law, foreign judgments may not be enforceable if the UAE would have had concurrent jurisdiction over the subject matter of the original proceeding.[68] Edge concludes that a UAE court would have had jurisdiction over the subject matter of the London Litigation.[69]

---

million. *See* 1/3/06 Letter from Madbak to FAL Oil Shareholders, Ex. 1 to Reply Affirmation of Mohammed Osman Fadul ("Fadul Reply Aff."). The letters each contain the disclaimer that they are "issued to the shareholders of the Company upon their request without any responsibility from our part." *Id.*; 12/21/05 Madbak Letter.

[65] *See Integrated Container Serv., Inc.*, 476 F. Supp. at 124 (upholding maritime attachment where defendants were foreign corporations with no ongoing business in New York). *Cf. Allied Maritime*, 2004 WL 2284389, at *2 (defendant maintained California offices and had sufficient assets in California to satisfy plaintiff's claims); *Aqua Stoli*, 384 F. Supp. 2d at 726 (defendant was an Australian company); *Royal Swan Navigation Co.*, 868 F. Supp. at 606 (defendant had offices and substantial assets in New York).

[66] *See* Declaration of Ian David Edge ("Edge Decl.") ¶ 11.

[67] *See id.* ¶ 13.

[68] *See id.* ¶ 14 (citing 11/20/93 Dubai Court of Cassation Judgment No. 117/93).

[69] *See id.* ¶ 15.

Therefore, Ullises would face "considerable difficulty in enforcing any judgment it obtains in the London High Court in the Courts of the UAE. If the various jurisdictional defences were to be actively pursued in the UAE courts then it would be unlikely that it would be enforced."[70] Ullises is reasonably concerned that FAL Shipping, a private company without the oversight of a board of directors, would "escape judicial reckoning by withdrawing themselves and their assets beyond New York's borders."[71]

FAL has no assets or presence in either the United States or the United Kingdom other than their attached EFTs through New York.[72] FAL argues

---

[70]     *Id.* ¶ 16. FAL's legal consultant practicing in the UAE submitted a conclusory, two-paragraph declaration stating that plaintiffs can normally expect that foreign judgments will be enforced in UAE courts. *See* Declaration of Charles S. Laubach, UAE Legal Consultant to FAL, at 2. But Laubach does not address any of the issues raised by Edge.

[71]     Ullises Mem. at 17. Ullises argues that FAL's prior conduct shows that it intends to avoid a judgment, because FAL indicated its willingness to post a bank guarantee in exchange for release of the attached funds, but never secured that guarantee. *See id.* at 12. This argument carries no weight. FAL's failure to secure a bank guarantee may have resulted from the unwillingness of banks to provide such a guarantee. *See* Tr. at 46.

[72]     The parties dispute whether Supplemental Rule B would allow Ullises to attach EFTs after a judgment in the London Litigation. Nothing in the text of Rule B or *Winter Storm Shipping* prohibits such an attachment. *See Aqua Stoli*, 384 F. Supp. 2d at 729-30 ("defendant's need to use the world's financial markets regularly ensures that attachment of EFTs will be as available post-judgment as it has been pre-judgment"). Regardless, this issue is moot because FAL has waived the argument. *See* Tr. at 31 (stipulation of Michael J.

that the fact that Ullises was able to attach over $40 million between November 28, 2005, and December 20, 2005 demonstrates that Ullises should be able to find adequate funds to satisfy any judgment after a decision is rendered by the London court.[73] But examination of FAL's EFTs through New York during that time period reveals that FAL Shipping only sporadically transfers small amounts of electronic funds through New York.[74] FAL claimed that FAL Shipping would make large transfers in the future, because it is contractually obligated to make payments on a guarantee amounting to $8.1 million.[75] But FAL cannot assure that FAL Shipping would make these payments after a judgment in the London Litigation. FAL Shipping's business operations are not necessarily dependent on EFTs through New York.[76]

Although FAL Oil was involved in one very large EFT, its transfers

---

Frevola, Counsel to FAL, waiving the argument that Supplemental Rule B does not allow attachment of FAL's EFTs post-judgment).

[73] See FAL Reply at 1.

[74] Only five of the EFTs seized between November 28, 2005, and December 20, 2005, amounting to $542,851.68, were on behalf of FAL Shipping. See Fadul Aff. at Ex. 1. FAL Shipping did not transfer electronic funds through New York from December 9, 2005 through December 22, 2005. See Tr. at 26.

[75] See id. at 12-13.

[76] See id. at 23.

were even more infrequent than FAL Shipping's.[77] FAL Energy uses EFTs through New York on a regular basis, but this Court has already found that Ullises may not attach the funds of FAL Energy.[78] In sum, Ullises has shown there is a reasonable basis for its need to secure any potential judgment by attaching FAL Shipping and FAL Oil's EFTs through New York.

## C. Service

FAL argues that the Attachment Order, which directs that "'service on any garnishee . . . is deemed effective continuous service throughout the day from the time of such service through the opening of the garnishee's business the next business day,'" violates the Second Circuit's holding in *Reibor*.[79] But *Reibor* does not apply to an order which makes service effective for a short and reasonable amount of time.[80]

It is not relevant that in *Ythan*, the garnishees agreed that service would be effective for the entire day and that here, the Court ordered the service to

---

[77]    FAL Oil was a party to two EFT transactions, one in the amount of $83,951.29 on December 14, 2005, and one in the amount of $23,780,690.04 on December 20, 2005. *See* Fadul Aff. at Ex. 1.

[78]    Nineteen of the twenty-seven attached transfers were related to FAL Energy. *See id.*

[79]    FAL Mem. at 15 (quoting Attachment Order at 2).

[80]    *See Reibor Int'l Ltd.*, 759 F.2d at 267-68.

be effective throughout the day, without any express agreement from the garnishees.[81] Some provision for continuous service is required to allow attachment of EFTs without significant disruption to financial institutions. The Attachment Order is intended to avoid the absurdity, security problems, and inconvenience of requiring the garnishee banks to accept service repeatedly throughout the day. Nothing in the Admiralty Rules prohibits this Court from issuing such an order to provide for a practical means of service, and no garnishee has objected to the Attachment Order.

Furthermore, Ullises re-served each of the garnishee banks that are currently restraining FAL's property, rendering this argument moot.[82] Because FAL's assets were in the garnishee banks' possession when Ullises' later processes of attachment were served, the *Reibor* requirement is satisfied.[83]

---

[81]     *See Ythan Ltd.*, 336 F. Supp. 2d at 307. Defendant concedes that if the banks had agreed to accept service throughout the day, such an agreement would have been "wholly acceptable." *See* 1/17/06 Letter from Frevola to the Court.

[82]     *See* Declaration of Patrick F. Lennon in Support of Plaintiff's Opposition to Motion to Vacate Maritime Attachment ¶ 40 ("In addition, on January 4, 2005 [sic] Plaintiff personally re-served each garnishee with the Amended Ex Parte Order and process of maritime attachment and garnishment.").

[83]     *See Winter Storm Shipping*, 310 F.3d at 274 n.7 ("TPI funds were in the bank's possession when Winter Storm's later processes of attachment were served, thereby satisfying the *Reibor* requirement."). *Winter Storm* distinguished *ContiChem LPG v. Parsons Shipping Co., Ltd.*, 229 F.3d 426, 434 (2d Cir. 2000),

## D.    Amount of Attachment

FAL requests that this Court reduce Ullises' security request in the amount of $1.5 million, representing Ullises' demanded attorneys' fees. While FAL does not dispute that Ullises would be entitled to attorneys' fees, should it prevail in the London Litigation, it argues that Ullises has not provided support for the claimed amount. Ullises' English solicitor has filed a declaration stating that $1.5 million "is a conservative estimate of our client's actual costs . . . of pursuing a very complicated, document intensive case" involving multinational cooperation, expert witnesses, and a six-week hearing.[84] Ullises has filed documentation supporting $1,312,504.38 in fees already billed, and $30,578.90 for work in progress.[85] Although this only amounts to $1,343,083.28, Ullises argues that it is likely to incur future fees far in excess of the difference in the "taxation of costs" and appeals process.[86] I am satisfied that Ullises' claim for attorneys' fees is neither frivolous nor excessive.

---

on the ground that there, the garnishee bank was in the possession of the defendant's funds "only as the result of a tactical course of conduct on plaintiff's part which the court regarded as improper." Here, as in *Winter Storm*, the plaintiff did not engage in any improper tactics.

[84]    Moisidou Decl. ¶ 30.

[85]    *See* Second Lennon Decl. ¶¶ 5-8, Ex. 1-2.

[86]    *See id.* ¶ 9.

## E. Counter-security

FAL also seeks counter-security in the amount of $12.5 million for wrongful attachments[87] and in the amount of £756,526.15 for its costs and attorneys' fees resulting from the London Litigation to date.[88] FAL conceded at the hearing that its counterclaims for wrongful attachments did not arise from the same occurrence or transaction that is the subject of the London Litigation.[89] But FAL's attorneys' fees in the London Litigation are inextricably intertwined with the original transaction that is the subject of the London Litigation.[90] FAL has provided invoices in support of its claim for fees and expenses.[91] Accordingly, FAL's request for counter-security is granted in the amount of £756,526.15.

## IV. CONCLUSION

For the foregoing reasons, the motion to vacate the Attachment Order as to FAL Shipping and FAL Oil is denied, the motion to vacate the Attachment Order as to FAL Energy is granted, and FAL's motion for counter-security is

---

[87]     See FAL Counterclaims at 24.

[88]     See Tr. at 16.

[89]     See id. at 18.

[90]     See Dongbu Express Co., 944 F. Supp. at 239-40 (granting counter-security after determining that the counterclaim arose out of the same transaction).

[91]     See 1/12/06 Letter from Frevola to the Court (attaching invoices).

granted in the amount of £756,526.15.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           January 20, 2006

## - Appearances -

*For Plaintiff:*

Patrick F. Lennon, Esq.
TISDALE & LENNON, LLC
11 West 42nd Street, Suite 900
New York, New York 10036
(212) 354-0025

*For Defendants:*

Michael J. Frevola, Esq.
HOLLAND & KNIGHT LLP
195 Broadway
New York, New York 10007-3189
(212) 513-3200